ELLINGSON ET AL., RESPONDENTS, v. SHAW ET AL., APPELLANTS.

(No. 8351.)

(Submitted April 30, 1943. Decided June 15, 1943.)

[138 Pac. (2d) 947.]

*Mr. D. W. Doyle,* for Appellants, submitted a brief and argued the cause orally.

*Mr. George G. Harris,* for Respondents, submitted a brief and argued the cause orally.

MR. JUSTICE ERICKSON, delivered the opinion of the court.

This appeal is from a judgment in favor of the plaintiff in a quiet title action involving oil and gas lands. The interests

the plaintiff sought to extinglish arose mainly out of a certain drilling agreement made between herself and George M. Shaw and K. C. Morton on October 7, 1939. The main point in contention here however is not the original drilling agreement but an alleged second agreement extending the time for the completion of the wells.

The original contract provides that Shaw and Morton shall drill two wells in 1940, and if they do not drill these wells during the year 1940, then their lease is terminated except as to the wells drilled or in the process of drilling and five acres surrounding each. One well was completed in 1940 but nothing was done on the other well until December 2, 1940, when Morton went to see the plaintiff to ask for an extension of time. The explanation for the extension was that, while the well could still be drilled in that month, yet Morton preferred to have Sid Porter do the drilling and Porter could not start right away.

According to Morton's testimony the plaintiff said that she wanted to see the well drilled as soon as possible, but if he had the well started in 1940 and had done sufficient work to assure her that he meant to complete the well, then it would be all right and she would not bother them. He further testified that she told him she would think about the whole proposition and give them a letter to the same effect the next day. The plaintiff did write the letter and it is as follows:

"Great Falls
Dec. 3rd, 1940

Mr. Morton and Mr. Porter
Kevin, Montana
Gentlemen:

After thinking over our conversation I still feel that I really do not wish to extend the time. But if drilling is started and I know that you plan to go ahead and complete the well, and in the event that the well is almost completed and the weather is so that it is impossible to finish, I most certainly will not

bother you in any way.  But feel it should be a reasonable time.

Very  truly  yours.''

On December 7th Morton replied to plaintiff as follows:

''Mrs. Leta Ellingson

Box 96, Great Falls, Montana

Dear Mrs. Ellingson:

Thanks for your letter of December 3rd regarding completion of this next well which we are now starting.

In accordance with our conversation with you on Dec. 2nd, we have already dug a cellar for the rig, moved part of the rig and part of the tools to the new location and unless weather gets too bad we intend to keep it going until the well is finished.

You stated in your letter that if drilling is started and you know that we plan to go ahead and complete the well, and in the event that the well is not yet completed that you will not have any objection to our having additional time in which to finish and you feel it should be a reasonable time.  We appreciate your writing this to us because we are now able to complete the deal for the casing on this well.

It is our intention and we are very willing to work steady and keep the well going strictly in accordance with your letter, except of course for severe weather.

As soon as we spud in I will let you know in order that you might have a chance to come up and visit the well.

Very sincerely yours,

Keith C. Morton''

On December 31, 1940, the well was spudded in and drilled to a depth of 16 feet. Nothing thereafter was done until January 21, 1941, when the well was drilled to 110 feet. On February 11th the plaintiff gave notice of cancellation informing the defendants of her intention to declare the forfeiture.  About 110 feet of the 1,700 feet had been drilled on the date of the notice. The driller, however, went ahead and drilled an additional 50 feet on February 26th.  The well was completed on April 14, 1941. It was a dry hole.

It is the defendants' contention that the plaintiffs waived ▮▮ the provision requiring the completion of the second well during 1940 and agreed to extend the time for completion. The defendants urge that they relied upon this agreement to extend the time and proceeded to the completion of the second well, spending large sums of money in so doing.

The plaintiffs answer this contention by saying that the letters and conversation amounted only to a departure from the original contract to the extent that the well did not have to be entirely completed in 1940; that the second agreement went only so far as to say that if the well was almost completed in 1940 but weather conditions prevented the completion, then the balance could be drilled in 1941. The facts show, plaintiffs argue, that there was only a "token" beginning of the well in 1940 and the delay in drilling from that time on was due to other things than the weather and thus the defendants breached the second agreement.

While the parties differ as to the terms of the extension agreement, for the purpose of this decision we will accept as correct defendants' version as set out in their letter of December 7th in reply to plaintiff's letter of December 3d—both of which are set out above. In their letter defendants say they understand that if they have started drilling in 1940, and even though the well is not completed in that year, there will be no forfeiture of the lease if they "work steady" and "keep it [the drilling] going until the well is finished," unless weather gets too bad, and to complete the well in what plaintiffs think is a reasonable time. The drilling was not actually started until the last day of 1940 when they drilled 16 feet, though there were twenty-four days left in that month after defendants' letter on the 7th. While it might be said that this was a sufficient starting of the well in 1940 according to defendants' version of the agreement, there might be some question of compliance even with this requirement in view of the language "in the event the well is not yet completed" in 1940 which

would indicate that both parties understood that a substantial amount of work should have been done in that year. The court from the facts certainly was justified in finding that there was no compliance with the part of the agreement requiring that defendants proceed steadily with the work, weather permitting, after the expiration of the year. No drilling was done after December 31, 1940, until January 21st when defendants drilled to 110 feet. That was all that had been done at the time of the notice of cancellation of February 11th. It can hardly be said that this is working ''steady'' or keeping ''it going until the well is finished,'' under defendants' version of the agreement.

While evidence was introduced tending to show that a part of the delay was due to adverse weather, the evidence generally pointed to other causes and there was evidence supporting the court's conclusion, and we are bound by the court's determination as shown in its judgment.

The defendants make the further contention that the plaintiffs, having accepted defendants' tender of the ten per cent. royalty, payable under the agreement to pay $400 to secure performance of the contract, plaintiffs are now estopped from claiming a forfeiture. The provision in the contract is as follows:

''Now, therefore, in consideration of the sum of one dollar ($1.00) receipt of which is hereby acknowledged, and other good and valuable considerations, and the mutual promises and covenants hereinafter contained, the said Parties of the First Part agree to complete the drilling of the well started on the above acreage, or in the event that it is deemed advisable to move from said location to some other location and drill an oil and gas well down to the Madison Lime, unless oil and gas is found in paying quantities before reaching the Madison Lime by June 1, 1940, and they further *agree to drill one other well* on the above described acreage to the Madison Lime, unless oil and gas in paying quantities is found at a lesser depth during the year 1940, *and* said *Parties of the First Part agree to pay*

the said Party of the Second Part, the sum of four hundred dollars ($400.00) out of the production, *and in order to insure and guarantee the said Party of the Second Part* that said wells hereinabove provided for be drilled, and the four hundred dollars ($400.00) be paid, the Parties of the First Part agree to and do hereby assign to said Party of the Second Part, a ten per cent (10%) royalty of all oil and gas that may be produced on the above described acreage, said ten per cent (10%) royalty to be held by the said Party of the Second Part until the four hundred dollars ($400.00) in cash as is hereinabove specified is paid, and that upon the payment of the four hundred dollars ($400.00), the said Party of the Second Part is to reassign and set over unto the said Parties of the First Part, the said ten per cent (10%) royalty hereinabove referred to.''

It is our view that the acceptance of this payment did not operate as a waiver of the right to terminate the lease. It seems to us that the plaintiffs were and are entitled to that amount under the contract and that right accrued before December 31, 1940.

The original contract contemplates just what occurred in this case. The next to the last provision is as follows:

''It is further understood and agreed between the parties hereto that if the parties of the first part shall fail to drill the oil and gas wells hereinabove referred to, or either of them, at the time and in the manner specified herein, then and in that event all of the rights of first parties hereunder shall terminate, except as to the producing well or wells, and wells being drilled, and to five (5) acres immediately surrounding each of said wells in the form of a square with the well in the center thereof, and it is further agreed that in the event of such termination the parties of the first part will hereby agree to re-assign and quitclaim said undrilled portions of said acreage to said second Party.''

The judgment of the trial court followed this provision and

allowed the defendants the five acres surrounding both wells and terminated any rights the defendants had to the balance of the land. We think that to be the correct result.

The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANDERSON, MORRIS and ADAIR concur.